the foreign ports of discharge. It would seem that these witnesses could as readily be produced at New Orleans as at New York. Libelants assert that it is in the interest of the insurance carrier that suit be brought here so that these foreign surveyors may conveniently testify in other suits being brought in this district.

I think it is apparent that the balance of convenience of the parties, and the witnesses, and the interests of justice require that these suits be transferred. St. Paul Fire & Marine Ins. Co. v. American Mail Line, D.C., 94 F.Supp. 28; Ortiz v. Union Oil Co. of Calif., D.C., 102 F.Supp. 492.

The motion to dismiss is denied, but the motion to transfer these cases to the Eastern District of Louisiana is granted.

Settle order on notice.

**GORHAM et al.**
v.
**UNITED STATES.**
No. 17865.

United States Court of Claims.
March 2, 1954.

Clarence E. Martin, Martinsburg, W. Va., and Bruce Parkhill, Chicago, Ill., for plaintiffs. George M. Weichelt, Tallahassee, Fla., was on the briefs.

William A. Stern II, Washington, D. C., with whom was Asst. Atty. Gen. Warren E. Burger, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER and MADDEN, Judges.

JONES, Chief Judge.

This is a Congressional reference case.

The plaintiffs are all of the former common and preferred stockholders and debenture holders of the Goshen Veneer Company, hereinafter referred to as Goshen.

The petition alleges that the United States is responsible for the loss of the entire assets of the company. Plaintiffs claim $509,434.92, plus interest, which they allege represents the value of the stock and debentures on July 31, 1942.

The Goshen Veneer Company was established in 1892 by Myron C. Dow and Charles E. Gorham and was operated as a partnership until it was incorporated in 1900. The ownership of the firm and all its stock remained in the hands of the organizers or their families up to April 1944. Since its inception Goshen has engaged in the manufacture of hardwood veneer and plywood. It was a pioneer in the production of hardwood plywood, had a most complete plywood manufacturing plant, and was one of the first to develop the hotpress technique for cementing veneer with thermo-setting resins. The average net sales for the years 1936 to 1941 was $558,200, with average net profits of $26,300, or 5 percent of sales.

A number of grounds are asserted as a basis for the claim. There is little agreement between the parties as to the facts of this case. The accounting records are badly mixed and are incomplete. Numerous items are involved, and it has been difficult to properly analyze the somewhat jumbled facts.

This case arises from transactions between Goshen, The First Bank and Trust Company of South Bend, Indiana (hereinafter called the Bank), The Federal Reserve Bank of Chicago (hereinafter the Federal Reserve), and the War Department during the period from the spring of 1942 through the summer of 1944.

Six of the main actors in the relationship among these institutions died prior to the trial. These included the officers of the Bank who had most to do with the negotiations of the loans; Mr. D. C. Folger, of the firm of Stevenson, Jordan and Harrison, Inc., Management Engineers, (hereinafter SJH) and Mr. R. B. Agler, to whom plaintiffs attributed mismanagement; and the company's accountant and attorney. The absence of the testimony of these men is especially unfortunate since assertions of oral representations and undocumented activities are prominent in plaintiffs' evidence. To get a clear picture of the company's situation from 1942 to 1944 when its contracts with the Government were in operation would require extensive analysis of the company's management and financial position during that period. The accounting and other records in evidence are entirely inadequate for such an undertaking.[1]

We are primarily concerned here with the period mid-1942 to mid-1944. During this time Goshen entered into V-loan arrangements with the First Bank and Trust Company of South Bend, which were guaranteed by the Federal Reserve Bank of Chicago, as fiscal agent for the War Department, as follows: May 22, 1942, $100,000; August 22, 1942, $600,000 (consolidating the prior loan); March 25, 1943, $1,000,000, incorporating the two prior loans. It is on the dealings of the parties in connection with these loans that plaintiffs base their claims.

It is the gist of plaintiffs' claim that at the special urging and request by procurement officers of the armed forces Goshen was required by law to convert to war production of military aircraft plywood in the summer of 1942; that as a result of these demands and of such conversion Goshen borrowed money from the Bank under the V-loan[2] program; that these loans were made upon the alleged representation by government officials that under this method of financing the company would be free to operate without any restriction; that the loan arrangements were in fact unduly restrictive and that in the administration of the loan the Bank exercised such an unwarranted degree of control of Goshen that in January 1943 a constructive trust arose in favor of the plaintiffs. There are also allegations of mismanagement which plaintiffs con-

---

1. This is indicated in the qualified nature of our findings in this respect. In the interest of perspective in this matter the following items from the record are noted: On September 4, 1951, plaintiffs filed a rather extensive motion for call on the Department of the Army with reference to the records of Goshen Veneer Company, which was subsequently denied by the court on September 21. Government counsel stated that the records of Goshen in defendant's possession consisted of some 15,000 pounds of documents located in Kansas City, and on September 13, 1951, prior to the denial of plaintiffs' motion, in the hearing before the Commissioner, made an offer that plaintiffs could inspect all records of Goshen in Kansas City, Chicago or Washington.

2. The "Regulation V-loan Program" was an arrangement whereby a producer of war materials could obtain money on a revolving credit basis from his local bank, and the Federal Reserve Bank, acting as fiscal agent for the War Department, guaranteed the loan. The actual servicing of the loan was done by the local bank.

tend are the responsibility of the defendant. The contention is also made that when, in April 1944, at which time the outstanding notes totaled over $960,-000, the plaintiffs conveyed all their stock and interest in Goshen to the Federal Reserve and the Federal Reserve released two members of the families from personal guarantees on loans, they did so upon the oral representation of defendant's agents that the Corporation would be returned to them at the end of the war. It is plaintiffs' position that the action of the Federal Reserve, as agent of the War Department, with regard to Goshen amounted to a taking of their property for which they are entitled to compensation under the Fifth Amendment to the Constitution. For reasons which appear below we think plaintiffs have considerably overstated their case.

The first claim that Goshen had no alternative but to convert to war production, and that it was in reliance upon the representations of the procurement officers that financing programs would be arranged under which the company could operate without any restriction, and that these representations caused Goshen to enter into the loan agreement which proved to be its undoing, is not entirely supported by the record before us.

On March 10, 1942, Mr. J. J. Snoke, general manager of Goshen, advised the Army Air Force procurement officers by letter of Goshen's availability for plywood manufacturing and offered its services in that regard. The evidence does not establish that agents of the War Department solicited the services of Goshen directly prior to the first V-loan of May 22, 1942. It also appears that on May 6, 1942, the company had prime or subcontracts with various agencies of the Government totaling $354,500 [3] and a sub-contract estimated at $600,000 was in the process of negotiation with the Bell Aircraft Company, who had a contract with the United States Army Air Forces. Goshen was contacted by representatives of the War Department during the summer of 1942 and the necessity of peak production for the war effort was stressed. It is significant, however, that the "puffing" by procurement officers which plaintiffs contend misled the management of Goshen as to the lack of restrictions included in V-loan financing occurred *after* the company had entered into the V-loan agreement for $100,000 revolving credit on May 22, 1942. Plaintiffs place great stress on a letter received from a Major Lyon with reference to V-loans. However, this letter which is before us only as quoted in the Report of the House Judiciary Committee, is dated July 29, 1942.[4] Admittedly, this letter contains some rather broad assertions and reflects the need for stepped-up pro-

---

4. As quoted in H. Rept. 2946, 81st Cong. 2d session, the letter of July 29, 1942, stated:

"This letter will verify the conversation you had with Mr. Martin P. Levin, a representative of this Office concerning the availability of guaranteed commercial bank loans for working capital.

"For the purposes of record, the points discussed by Mr. Levin are recapitulated.

"1. No contractor, regardless of size, need be hampered by lack of working capital.

"2. The process of obtaining a loan is quick and easy for qualified borrowers.

"3. Loans are made and paid at the borrower's regular bank. The Government guarantees the loan.

"4. Normal credit requirements are not involved. Capitalization, present cash position, plant worth are secondary to size and importance of the war contract, the capacity and ability of the borrower to perform under the contract.

"5. Loans are made for 2 to 5 years with a top interest rate of 5 percent.

"6. Such loans are quickly and easily obtained, sometimes within 72 hours.

"Peak production is essential now. Only by every producer, large and small, operating without any restriction of any kind, can the flow of production rise to meet the present urgent need.

"If you should desire to take advantage of this plan sometime in the future, a letter to the undersigned will be sufficient to have a fully qualified Army Air Force officer dispatched to your plant to

duction which was urgent at that time. It must, however, be considered in the light of the fact that Goshen had then been operating for two months under the same type loan arrangement as the two subsequently entered into. The loan agreements of August 22, 1942, and March 25, 1943, differed from the former one only in that additional security provisions were added commensurate with the additional credit extended. Plaintiffs point out that the conditions attached to subsequent agreements were progressively more restrictive. This is true but the credit extended was 5 and 9 times as great, respectively. In this connection it might be noted that the May 22, 1942, loan for a revolving fund of $100,000 provided for a mortgage of all real estate, equipment, tools, machinery and personal property except inventory; the assignment of the proceeds of all contracts with the United States or various departments thereof; the subordination of outstanding debentures of $26,064.70 to the loan; prohibition of the payment of any dividends during the period of the loan; quarterly (or if required by the Bank, monthly) balance sheets and accounting records certified by a certified public accountant; the personal guarantees of J. J. Snoke and Dow Gorham for the repayment of funds advanced; and an acceleration clause to be effective in case of a breach of any of the terms of the agreement.

In view of the above we cannot say that at the time the August 22, 1942, loan was made the management of Goshen could have reasonably concluded that financing under the Regulation V-loan program involved no restrictions.

Following the first V-loan, Goshen received further subcontracts and about the first of August 1942, 2d Lt. George E. Dilley, Assistant to the District Financial Officer, contacted the company for the purpose of assisting in obtaining an increased loan which Goshen had contemplated making as early as July 6, 1942. On August 7, 1942, the Bank applied to the Federal Reserve for a guarantee for a loan of $600,000, being an increase of the $100,000 credit by $500,000. Neither the Bank nor the Federal Reserve thought it desirable from a banking standpoint to make the increased loan, but inasmuch as War Department officials stated that production of items under subcontract to Goshen was vital to the Government they agreed, and the loan was made August 22, 1942, in the amount of $600,000. In addition to the provisions securing repayment under the former agreement, which were incorporated in the August 22 instrument, the latter provided, *inter alia,* that the Bank, at its election, could require separate accounts for funds advanced and the countersigning of checks; inspect the books and records of Goshen; and make advances in its sole discretion; also, monthly balance sheets certified by Certified Public Accountants; approval by the Bank of all contracts for over $25,000 and the acquisition of any fixed assets over $2,000 was required.

As will be alluded to later, the overextension of the Goshen Veneer Company which seems to have been the original source of its difficulties stemmed from the commitment included in this loan. This would seem an appropriate point to recapitulate our conclusions concerning plaintiffs' first contention.

 While plaintiffs cite the Selective Service Act of 1940 [5] as authority

assist in the operation of this financing plan."

Plaintiffs contended that the conversation with Mr. Levin which this letter confirmed took place prior to the negotiation of the May 22, 1942, loan. This was based on the testimony of Mr. J. J. Snoke who also stated that the visit of 2d Lt. Dilley was prior to the first loan agreement. This error was later corrected as the hearing of the case proceeded.

5. 50 U.S.C.A.Appendix § 309. This statute empowered the President to seize industries vital to war production under certain circumstances and also provided for penalizing officers of such an industry if cooperation with the Government was refused.

for the argument that they were required to convert to war production, there is no assertion that a threatened seizure was an element in the shift of Goshen to war production, nor that apprehension of its invocation in any way influenced its management. We, therefore, feel that discussion of this point is not required. There is little doubt that Goshen could have been required to participate in war production but the real question here is whether it *was* forced to overexpand its operations.

■ For reasons indicated above we conclude that Goshen's conversion to war production was not induced by misrepresentations of officials of the War Department that financing under the V-loan program would leave it free to operate without any restrictions. In doing so, however, we are cognizant of the fact that the pressure to go into such production was considerable, both for patriotic and economic motives. Our enumeration of the facts on which the conclusion is based is indulged in merely to indicate that the evidence presented does not warrant a finding that Goshen was subjected to such extraordinary pressure as to relieve its management of all responsibility for the difficulties which ensued. On the other hand, it is clear that the urgency with which War Department officials viewed the loan of $600,000 was an important element in Goshen's participation in it and must be a major consideration in the final disposition of this case.

We turn now to plaintiffs' contention that the banks assumed such unauthorized control of Goshen's management after December 1942 that a constructive trust arose in favor of the corporation and its shareholders. Further, that the decline in the value of the company was caused by alleged mismanagement for which defendant is responsible. Plaintiffs' argument on this point is based on factual assumptions at variance with our finding, making a brief summary of the facts necessary.

Much of Goshen's work after conversion to war production was in the production of wooden aircraft parts, some of which were experimental in nature, under cost-plus-fixed-fee subcontracts with prime contractors of the various military services. The extent of expansion which occurred in the course of conversion is indicated by the fact that in early 1943 it had 575 employees as compared with 175 prior to the war. During the fall of 1942 Goshen experienced difficulty in furnishing the Bank with accounting and financial data, as required under the loan agreement, which would adequately inform the Bank of the company's financial position. Mr. Van Antwerp expressed his concern about this to the management and in October was advised by Mr. J. J. Snoke that C. W. Snoke had been hired as office manager and such reports would be expedited. By November 10, 1942, outstanding notes under the V-loan totaled $597,964.28, leaving an available credit of $2,035.75. Some of the difficulty encountered by Goshen in presenting a reliable fiscal picture of its operations seems to have stemmed from the lack of a cost-accounting system adequate for the proper handling of the cost-plus-fixed-fee contractual arrangments. Then on December 31, 1942, the company's accountant, Mr. Croop, advised the Bank that his failure to submit the required statements for October and November was due to the necessity of building an entirely new financial system beginning with the fiscal year October 1941, in order to have proper cost accounts for the new air parts contracts.

In view of these difficulties Mr. Van Antwerp of the Bank strongly advised that some action be taken to strengthen the management of the company, particularly with regard to its financial affairs. When Mr. J. J. Snoke advised the Bank in late December 1942 of a proposed subcontract with Bell Aircraft Corporation for a minimum estimated value of $2,500,000, which would require additional operating capital, Mr. Van Antwerp seriously questioned such an arrangement since the company was

then using a full line of credit and accounting records were not being furnished which informed the Bank of the company's fiscal position and hence the propriety of extending further credit. Mr. Van Antwerp stated that unless the Bank was furnished with adequate financial data it would have to install its own accountants. There was the additional complication at about this time that a subcontract which Goshen had with G. & A. Aircraft Inc., under which Goshen claimed $250,000, was cancelled for the convenience of the Government. This was a cost-plus-fixed-fee arrangement which required cost records before settlement could be effected between Goshen and the prime contractor.

Sometime in January 1943 Goshen hired the firm of Stevenson, Jordan and Harrison, management engineers, to conduct a survey of Goshen's problems, furnish guidance on questions of cost determinations, review the facilities and furnish studies and briefs on the major contracts then in process. While it appears that this action was taken in response to Mr. Van Antwerp's insistence that some action be taken to strengthen management, SJH was Mr. Snoke's selection and though this and other problems of the company were discussed from time to time in conferences which included officials of the Federal Reserve, a finding that the Federal Reserve directed the hiring of SJH is not warranted. SJH, on behalf of Goshen, retained the services of Haskins & Sells, certified public accountants, to make an audit of the accounts of Goshen.

Following a conference in mid-February between Mr. Olson of the Federal Reserve, Major Keehn, liaison officer of the War Department and two members of SJH, it was Mr. Olson's view that although Goshen was producing material urgently needed for the war effort, the best interests of the war program would be served by keeping the company's operations within a latitude more consistent with its management and financial capacity, and that additional credit should not be extended.

On February 22, 1943, the Bank notified Mr. J. J. Snoke that pursuant to the loan agreement it was electing to require that all future advances made to Goshen be deposited in a separate account from which withdrawals could be effected only when countersigned by Mr. H. P. Rausch, an employee of the Bank, who would spend his full time at Goshen's office in connection with the revolving credit. Mr. Snoke replied that the matter of countersigning would have to be presented to the Board of Directors for its approval, but pending such action checks would be presented to Mr. Rausch so that he could supervise the distribution of funds.

SJH submitted its report on February 25, 1943, which indicated that production, engineering and quality of product were entirely satisfactory, but that Goshen was deficient in certain aspects of business management. It was stated that inadequacy of cost control and accounts was a major factor in the company's weak financial position; operations had expanded to such an extent that maintenance of control was beyond the scope of one person; management was overburdened with a mass of details; and the situation was aggravated by the loss of key production men to the draft. Remedial measures were suggested and it was recommended that an additional credit of $380,000 be obtained, which it was believed could be retired by July 1943.

On March 8, 1943, the Bank filed a new application for a 97 percent guarantee of a $1,000,000 revolving fund. A loan agreement for this amount was executed March 25, 1943, with maturity set for August 15, 1943, which incorporated the prior loans. In addition to provisions to secure payment of the amounts advanced under prior loans, the agreement provided, *inter alia*, that 51 percent of the outstanding voting shares of Goshen would be pledged to the Bank; Goshen would maintain management satisfactory to the Bank; and after the date of the agreement Goshen would retain the services of SJH.

At the time of this agreement Mr. J. J. Snoke and Mr. C. P. Olds, attorney for Goshen, demurred to giving a pledge of 51 percent of the voting stock because of a fear that the Bank might be in a position to obtain control of the business. It was explained by Mr. Olson that collateral could not be foreclosed without the consent of the War Department and the War Department under no circumstances would be interested in depriving the owners of the business as long as the terms of the guarantee agreement were being fully complied with. It was pointed out that the company's application for one million dollars of credit presented the necessity of developing the most feasible basis for such a loan and under the precarious condition of Goshen at that time, the terms of the agreement as authorized by the War Department and demanded by the Bank offered the only practical plan.

The record justifies the conclusion that up to the March 25, 1943, loan agreement, Mr. J. J. Snoke was both in name and in fact the general manager of Goshen. He remained general manager after that time until the reorganization of the company about July 1943, with SJH acting in an advisory capacity. However, as indicated in finding 20, their influence on operations was considerable.

Goshen continued to experience difficulties and following the developments set out in finding 19, a corporate reorganization was effected sometime in June 1943. Under this reorganization, the board of directors consisted of Dow M. Gorham, Charles E. Gorham, John J. Snoke, H. P. Rausch, and D. C. Folger. Mr. Rausch was the nominee of the Bank and Mr. Folger was the representative of SJH who under the terms of the loan agreement was to be in control of the management. The pledge of 51 percent of the voting shares of the corporation, previously made to the Bank, was transferred to the Federal Reserve as fiscal agent for the War Department with the provision that it might be voted at the direction of the financial contracting officer attached to Headquarters Army Service Forces. The new bylaws provided for the removal of officers by a vote of the shareholders and made the office of general manager-secretary-treasurer the principal executive office of the company. Mr. Folger was elected to the office of general manager and Dow Gorham to the presidency. While the Dow and Gorham families retained a majority of directorships who uniformly voted for all resolutions passed by the Board up to April 17, 1944, and the Federal Reserve did not exercise the right to vote the shares held as collateral, considerable *de facto* control of the management passed to the Banks with this reorganization.[6] However, Mr. Snoke remained prominent in the operation of the business.

█ We cannot conclude from these facts, and others to which we presently allude, that the degree of control exercised by the Banks over the affairs of this company was such an unwarranted usurpation of authority or unauthorized exercise of control as to give rise to a constructive trust. The influence exercised on management was in line with that authorized in the loan agreement of March 1943. This is not to say, of course, that plaintiffs were responsible for all the difficulties which ensued nor that the fact that management satisfactory to the Bank was authorized by the loan agreement gives unlimited license to impose mismanagement resulting in the loss of a business.

We turn now to the question of whether it is established that the losses sustained resulted from mismanagement for which defendant is responsible.

In attempting to determine this question the circumstances under which the new management operated is a primary consideration. It is clear that management under the reorganized corporation

6. According to the records in evidence, the net worth of the company on June 30, 1943, was $78,223.07.

did not meet the expectations of either the Bank or the Federal Reserve. It appears that the difficulties in producing prompt accounts continued and a satisfactory system was not established prior to Mr. Folger's resignation in December 1943. The financial statements for July and August were not forwarded until October. In November 1943 both the Federal Reserve and the Bank were expressing dissatisfaction with the slowness of accounts.

These developments must be put in context, however, before the decline of Goshen is attributed to them. According to accounting records before us, the company was seriously overextended by the spring of 1943. The large G. & A. Aircraft cost-plus-fixed-fee subcontract had been cancelled for the convenience of the Government, and cost records were inadequate to support Goshen's claim for settlement. On June 28 a subcontract with Bell Aircraft Corporation, under which some $150,000 was claimed, was cancelled for the alleged default of Goshen. Much of the accountants' time was consumed in trying to develop past records to support these claims. In July 1943 the outstanding notes under the loan totaled $942,193.27.

Most important perhaps is the fact that during the summer of 1943 the entire wooden aircraft program, in anticipation of which Goshen had expanded, was decelerated sharply and its impact on the company is indicated by the fact that by November 1943 operations were only slightly larger than prewar. The curtailment of this program seems to be the really crucial fact underlying the company's decline. When statements for July and August were submitted they reflected a profit of $2,700 and a loss of $5,800, respectively, and the tentative balance sheet for September 30 indicated a loss of $60,000. With the curtailment of the aircraft program it became necessary to reconvert for commercial type production which entailed different facilities and a contraction of operations in spite of high overhead geared to war production.

The rapid curtailment of the aircraft program generally had a depressive effect on prices and the acquisition of other business became more difficult.

In August 1943 credit under the V-loan was extended for one year and in January 1944 the rate of interest was reduced from 5 to 3 percent.

In November 1943 Mr. Van Antwerp of the Bank was urging that the contracts in process be completed promptly and the company placed in bankruptcy in order to preserve assets. At this time Goshen was not regarded as essential to the war effort.

Mr. Folger resigned as general manager in November and in doing so suggested that since operations were at approximately prewar levels Mr. J. J. Snoke could handle the operations. The Bank demurred to such an arrangement, and in considering a replacement for Mr. Folger a Mr. McCurdy was suggested. Mr. Snoke objected to the employment of McCurdy as chief executive with the result that Mr. R. B. Agler was employed as manager to be responsible for the financial and accounting aspects of the business, with Mr. Snoke in charge of operations. The Bank disapproved of this arrangement and on January 24, 1944, demanded and the Federal Reserve purchased, pursuant to the Guarantee Agreement, all but $10,000 of the principal amount of the loan. After this date the Bank was out of the picture except for the servicing of the loan for which it was paid a fee by the Federal Reserve.

The operation of Goshen from January to April 17, 1944, is not clearly reflected by the evidence presented, but on the basis of this record the situation appears to have been approximately as follows:

The net worth of the company on January 1, 1944, is stated to have been $17,626.63. Efforts were made to develop civilian business but this was not particularly successful in terms of operating results. Plaintiffs have placed much emphasis on the contract signed by Mr. Snoke and the Milcrest Company

on January 31, 1944, as set out in finding 24. As pointed out there, while Mr. Snoke stated that financing would be handled by advances from that company, there was no provision in the contract to that effect and in April the necessary permission from the War Production Board had not been obtained, rendering successful operation in Goshen's existing condition somewhat doubtful. Advances for operations were continued under the loan arrangement and according to Federal Reserve correspondence in evidence the balance sheet as of February 29, 1944, showed a deficit in net worth as against debts of $1,116,000, and the operations for the five months prior to that date resulted in losses of $23,763. From the same source it appears that by April 8, 1944, Mr. Olson reported to Federal Reserve officials in Washington that the assets had deteriorated to the point that $100,000 would have to be injected into the company to provide an adequate working fund. At about the same time a $147,051 contract with the Glenn L. Martin Company was cancelled for the convenience of the Government. By April 12 Mr. Olson was of the opinion that the company should be "placed under the jurisdiction of a proper court, to the end that the Government's interest be fully protected" and the preference of unsecured creditors might be avoided. It was at a conference on this date (see finding 31) that the Federal Reserve was first advised verbally by Mr. Snoke that he had entered into the Milcrest contract (see findings 24 and 31). Another conference was held April 14, 1944, at which time the lack of a formal agreement for financing by Milcrest and a WPB permit to manufacture the furniture under the contract was discussed. A decision was reached to make no further advances under the loan except to meet the payroll and other commitments of the company to its employees. Major Grant Keehn, liaison officer of the War Department, notified Mr. J. J. Snoke of this decision by telephone, which was later confirmed by letter. Mr. Snoke then contacted Mr Jacob Geffs of Hubbard, Baker and Rice, attorneys then retained by Goshen in connection with the G. & A. and Bell Aircraft claims. Mr. Geffs thereupon requested a conference with officials of the Federal Reserve and the War Department, which was held on April 15, 1944. At this conference Mr. Geffs made certain proposals with reference to the signing over of the company to the War Department and the release of Dow Gorham and J. J. Snoke from their personal guarantee of the V-loan.

On April 18, 1944, plaintiffs executed the following instrument:

"Whereas, the Goshen Veneer Company, an Indiana Corporation, is largely indebted to the Federal Reserve Bank of Chicago, Illinois, as Fiscal Agent of the War Department of the United States, and

"Whereas, the assets of said Company are wholly insufficient to pay the secured claims of the said Bank, and

"Whereas, the shares of common stock, shares of preferred stock and debentures of said Company are for all practical purposes without value,

"Now, therefore, in consideration of One Dollar ($1.00), paid to each of the undersigned, receipt of which is hereby severally acknowledged, and other good and valuable considerations, the undersigned, being the owners of all of the shares of common stock, shares of preferred stock and debentures in and of the said Goshen Veneer Company, do individually and severally make over, assign and transfer each for himself or herself, his or her entire right, title and interest in and to any and all such shares of common stock, shares of preferred stock and debentures to the said Federal Reserve Bank of Chicago, Illinois, as Fiscal Agent of the War Department of the United States absolutely."

A release was given by the Federal Reserve of the personal guarantees of

J. J. Snoke and Dow Gorham. The company was subsequently liquidated as set out in our findings 35 through 45, and, according to the records in evidence, the War Department lost $129,845.31 on this transaction.

Unfortunately the complex of factors which probably contributed to the decline of this company are not comprehensively documented in this record and we are cognizant of the danger inherent in concluding from isolated instances and figures quoted from unverified accounting records that certain actions did or did not result in the deterioration of a business enterprise. However, considering the entire record before us we are of the opinion that while there were deficiencies in management after June 1943, those deficiencies cannot be said to have been the cause of the company's decline in value and ultimate extinction. The basic cause of the difficulties appears rather to have been an overextension of operations, encouraged and urged by the War Department, to meet the urgent requirements of the projected wooden aircraft program and its subsequent abandonment before the expansion could be amortized. The situation was further aggravated by the necessity of reconverting to commercial production, which required different facilities, and the restrictions then existing on civilian production.

Plaintiffs urge that their ownership was unaffected by the execution of the above instrument, on the theory that they were induced to do so by misrepresentations of the War Department "that the company was insolvent, that the assignment of the stock would avoid the expense of foreclosure and that in this way they could hope to get their plant back later." We find that the War Department made no representations to plaintiffs that the assignment of the stock would result in the return of the company to them.

As we understand plaintiffs' position, it is not contended that Goshen was not in fact insolvent nor, in so far as we can ascertain, that foreclosure was not in fact imminent. It is rather that the War Department was responsible for the existence of these conditions. This aspect of the case centers around a controversy concerning the Guarantee Agreements between the Bank and the Federal Reserve, which were involved in each of the four V-loans to Goshen.

Each of these four Guarantee Agreements contained a section entitled "Protection of Borrower Against Cancellations" (see finding 7) which provided for the waiver of interest and suspension of maturity of the loan under conditions summarized below.

The Borrower was entitled to request an adjustment under this section. Whereupon the Bank in agreement with the Reserve Bank and the Borrower was to determine the ratio of (a) total dollar volume of Borrower's cancelled contracts (not by reason of fault of the Borrower) which had been cancelled between the date of the Agreement and date of request by Borrower to (b) aggregate dollar volume of original face amount of all war production on hand at the time of or accepted subsequent to the date of the Agreement, less the total dollar volume of all payments made on such war contracts prior to Borrower's written request. After agreement was reached as to the ratio of (a) to (b), the unpaid principal amount of the loan was then to be multiplied by the agreed-upon ratio of (a) to (b), and the product of this computation represented the portion of the loan on which interest would be waived and maturity suspended until a certain time subsequent to the settlement of the cancelled contracts. There was the further proviso that no waiver or suspension was to be made if the ratio of (a) to (b) was less than one-fourth.

After a thorough appraisal of the evidence we conclude that the management of Goshen received a copy of at least one Guarantee Agreement, if not copies of all four such Agreements. In each of the four loan agreements, signed by J. J. Snoke and Dow Gorham, it is set out that the Borrower under-

stands that such an agreement had been entered into between the Bank and the Federal Reserve; that a copy of such agreement had been delivered to the Borrower; and that the Borrower promised to do all acts necessary by the terms of the Guarantee Agreement for the Bank to comply therewith. On January 16, 1943, Mr. Van Antwerp of the Bank specifically called to the attention of Mr. C. W. Snoke the necessity for compliance with the Guarantee Agreement. Whether delivery of an instrument has been made is a question of fact, inferable from the circumstances. Massachusetts Trust Co. v. Loon Lake Copper Co., 9 Cir., 4 F.2d 847. It is not established that there was an attempt by anyone to invoke this section of the Guarantee Agreement but plaintiffs contend that it should have been invoked; that the defendant is responsible for not doing so and that the insolvency of the company resulted. In the absence of sufficient competent evidence to determine with any degree of accuracy the status of Goshen's contracts at any particular time, we feel that speculation as to when the section could or should have been invoked and whether such action would have prevented insolvency is not justified. Our conclusion is that any misconceptions which plaintiffs may have had as to the possibility of the return of the company to them were not the responsibility of the defendant. It appears that the assignment was made to avoid the expense of some other form of liquidation and to obtain the release from liability of two members of the family, Dow Gorham and John Junior Snoke.

In so far as is ascertainable from the entire record presented to us, we conclude that the management of Goshen was sufficiently responsible for the difficulties of that company to preclude recovery from defendant in a court of equity. Our report to the Congress is that no amount is legally or equitably due plaintiffs from the United States.

This is not to say, however, that plaintiffs do not have an appealing case which the Congress, in its discretion, may wish to rectify. We therefore make the following summary of our findings.

We conclude that the loss of plaintiffs' business was caused, fundamentally, by an overexpansion of its facilities in anticipation of the requirements of the projected wartime wooden aircraft program and the subsequent abandonment of this program before amortization could be effected. While not guilty of coercion or misrepresentation, it is established that the War Department urged and encouraged the Goshen management in this overexpansion. The company's more immediate difficulty resulted from the inability of its management to effectively establish, at the expanded level of operations, sufficient cost control and accounting records to meet the requirements of experimental cost-plus-fixed-fee subcontracts on which it was engaged.

We would suggest that the Goshen Veneer Company was a casualty of the necessities of the wartime wooden aircraft program. Though not without some responsibility for its predicament, the fact remains that Goshen was a well-established and excellent small manufacturer which expanded too rapidly in an effort to meet what could have been a crucial need for military aircraft and in the process lost control of its operations.

The propriety of compensation under such circumstances being within the discretion of the Congress, we set forth below the net value of the Goshen Veneer Company at various times as shown by the accounting records in evidence [7] as a possible guide should such action seem desirable.

September 30, 1941....... $207,854.16
September 30, 1942....... 227,358.00
June 30, 1943............ 78,223.07
January 1, 1944.......... 17,626.63

7: See finding 34 for qualifications of accounting records.

Sacrifices in wartime are usual rather than the exception. It appears, however, that the losses of plaintiffs were above the ordinary even for wartime. While some of these losses were due to the inexperience of plaintiffs in wartime production, at least a portion of the loss was due to the Government's abandonment of the wooden aircraft program on the basis of which Goshen had been encouraged to expand.

While there is no obligation that can be enforced against the Government, we recommend a payment of $75,000. This would be in the nature of a gratuity, but in the light of all the facts of record it seems to us the payment of this sum would be a fair adjustment.

MADDEN, WHITAKER and LITTLETON, Judges, concur.

**PRINCE v. UNITED STATES.**
**No. 49444.**

United States Court of Claims.
March 2, 1954.

Burr Tracy Ansell, Washington, D. C., for plaintiff.

H. S. Fessenden, Washington, D. C., H. Brian Holland, Asst. Atty. Gen., Andrew D. Sharpe and Ellis N. Slack, Washington, D. C., on the brief, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, and MADDEN, Judges.

MADDEN, Judge.

The plaintiff is the widow and executrix of the estate of Colonel Frederick A. Prince who died on September 3, 1951. Colonel Prince had been receiving retired pay since 1943 on account of service in the United States Army. For the taxable years 1944, 1945, 1946, and 1947 Colonel Prince and the plaintiff had filed separate income tax re-